**NORTH CENTRAL AIRLINES, INC., Appellee,**

v.

**CONTINENTAL OIL COMPANY, Appellant.**

**No. 76–1911.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1977.

Decided Feb. 23, 1978.

Rehearing Denied April 4, 1978.

John H. Schafer, Washington, D. C., with whom Barry E. Cohen, Washington, D. C., was on the brief, for appellant.

Raymond J. Rasenberger, Washington, D. C., with whom John H. Quinn, Jr., Washington, D. C., was on the brief, for appellee.

Before WRIGHT, ROBINSON and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Appellee-North Central Airlines, Inc. ("North Central") and appellant-Continental Oil Company ("Conoco") are parties to a contract for the purchase and supply of aviation fuel. North Central's breach of contract claim involves the proper interpretation—or alternatively the continued legal effect of—a clause of the contract provid-

ing for adjustment of prices for aviation fuel based upon posted prices for the crude oil from which the aviation fuel is refined.

## I. BACKGROUND

In June, 1969, the parties entered into a contract under which Conoco, a petroleum producer, refiner, and supplier, would meet the aviation fuel requirements of North Central at the Denver, Colorado airport (J.A. 401–09). This agreement expired on December 31, 1971, but a 1971 amendment extended its terms through December 31, 1974 and also made other minor changes in fuel quantities to be supplied and in the terms of payment (J.A. 410–11).

The price adjustment clause of the contract, which is the focus of this litigation, provides as follows:

A. The Base Price, excluding all taxes, storage charges and into-plane service charges (into-plane service charges to be at North Central's expense) for all Conoco Jet-50 delivered hereunder shall be $.1100 per gallon.

B. *Crude Oil Cost Escalation*

The Base Price set forth in A above shall apply when the *arithmetic average price* for Wyoming Sweet Crude Oil (40 gravity) *posted* by Continental Oil Company and Pan American Petroleum is *$3.23* per barrel (average *posted price* as of March 10, 1969). The Base Price shall increase or decrease, as the case may be, $0.00125 [⅛¢] per gallon for each full five cents (5¢) per barrel change in the average *posted price* for Wyoming Sweet Crude Oil in effect on the date of delivery.

J.A. 409 (emphasis added).

This contract clause is similar to that found in contracts in general use in the aviation fuel industry. The clause, some-

times referred to as an "escalation clause," uses the posted price for a particular grade and weight of crude oil, the material from which jet fuel is refined, as the benchmark for the price to be paid for the jet fuel under the contract. Increases in the posted price for the particular grade of crude cause the price for jet fuel to rise in direct proportion to the increase in the price for crude. For example, from the contract's inception until April 1, 1974, crude oil price increases posted by Conoco and Pan American Petroleum (now "Amoco") caused the price of aviation fuel sold to North Central to increase from 11¢ to 15.843¢ per gallon (J.A. 409, 414–A, 447). Relying on such a standard eliminates the need to renegotiate continuously the contract price. Using this standard also establishes a price for jet fuel which closely reflects the cost of the raw material from which the product is produced.

This contract operated effectively to meet the expectations of both parties until the early 1970s, when events in both the world and domestic market for oil severely disrupted the relationship of Conoco and North Central. After 1970, domestic production of crude oil declined steadily.[1] Concomitantly, the United States became increasingly dependent upon foreign oil.[2] Much of this foreign oil was obtained from the Organization of Petroleum Exporting Countries (OPEC), which was formed in 1970 and which subsequently resulted in increased prices of the oil produced by the member countries.[3] Until the early 1970s, foreign oil prices were lower than domestic prices; however, foreign prices caught up with and overtook domestic prices,[4] which were first subjected to federal controls in

1.  United States Department of Commerce, Bureau of the Census, Statistical Abstract of the United States, [hereafter Statistical Abstract], No. 1211, at 712 (1976) (domestic production of crude petroleum declined from 3,517 million barrels in 1970 to 3,057 million barrels in 1975).

2.  *Id.* (U.S. imports of crude petroleum increased from 483 million barrels in 1970 to 1,498 million barrels in 1975).

3.  *See* Joint Declaration Issued at International Economic Summit Meeting, May 8, 1977, at 13 Presidential Documents 673 (1977).

4.  *Compare* Statistical Abstract, No. 707, at 438 (price of crude petroleum, testing 25° A.P.I. or more (Venezuela) increased from $2.30/barrel in 1970 to $3.41/barrel in 1973 to $11.66/barrel in 1975) *with* Statistical Abstract No. 1211, at 712 (price of domestic crude petroleum increased from $3.18/barrel in 1970 to $3.89/bar-

1971.[5] This scenario was complicated by the 1973 Mid-East War and the oil embargo by the Arab oil-producing nations against the United States. World prices for oil increased further, which caused severe strains on the domestic economy and serious disruptions in markets relying upon or merely related to oil.[6]

Cognizant of the developing situation in world oil markets, the Federal Cost of Living Council (CLC) on August 19, 1973 imposed in connection with the introduction of Phase IV price controls a program of two-tier crude oil price regulations (38 Fed.Reg. 22536 (1973)).[7] Simply put, this regulatory scheme attempted to stabilize prices while at the same time providing economic incentives to the development of new oil sources. The regulations defined "old oil" as a volume of oil equal to the total production from a property during the corresponding month of 1972 (39 Fed.Reg. 31623 (1974)). A ceiling price for "old oil" was set at the highest posted price for each grade of crude oil in that field on May 15, 1973, plus a small incremental amount pegged in the regulation (38 Fed.Reg. 22538 (1973)). The regulations established a second tier of "exempt" or "new" oil that was not subject to price control. This tier included, *inter alia*, all crude oil produced from existing wells in excess of "old" oil quantities. The regulations provided for a ceiling on domestic crude petroleum prices but allowed exempt crude and an equivalent amount of old crude to be sold at prices above the ceiling.[8]

Thus, the CLC established a two-tier pricing system. During the period in dispute in this case, April to December, 1974, old oil of the type specified in the contract's price escalation clause was purchased at its controlled level of approximately $5.31 per barrel (J.A. 456); exempt oil of the same type was purchased at about $10.13 per barrel in April, 1974, and rose to a price of $12.00 in December (J.A. 457–61).

During the first few months of two-tier price controls, Conoco did not publish price bulletins for exempt oil (J.A. 299–300). Since its only posted prices for crude oil during this period were for old oil, Conoco charged North Central a price based upon Conoco's and Amoco's postings for old oil (J.A. 323–5). Also, during this period, Conoco was forced to rely upon higher cost exempt oil to operate its refinery and supply its customers. Conoco requested its customers to accept price increases and many agreed (J.A. 323, 327). North Central, however, did not, and Conoco sold aviation fuel to North Central at a price based upon the frozen "old" crude oil prices.

In March, 1974, after it became apparent that two-tier pricing was not a temporary phenomenon, Conoco began to post prices for exempt oil (J.A. 330). Amoco was already posting prices for exempt oil, and accordingly, effective April 1, 1974, Conoco began to charge North Central a price for jet fuel based on *both* the Conoco and Amoco postings for old oil, which were set at the government's frozen price for that oil, *and*

---

rel in 1973 to $8.00/barrel in 1975). *See* 38 Fed.Reg. 22536 (1973).

5. J.A. 129.

6. *See* 12 Presidential Documents 1720–21 (1976).

7. Under authority of the Economic Stabilization Act of 1970, Pub.L. 91–379, 84 Stat. 799, as amended, and the Emergency Petroleum Allocation Act of 1973, Pub.L. 93–159, 87 Stat. 628, 15 U.S.C. § 751 et seq. (Supp. V 1975), the Cost of Living Council proposed the two-tier pricing system on July 19, 1973 (38 Fed.Reg. 19464 (1973)). The system became effective on August 19, 1973, pursuant to action of the Council of August 17, 1973 (38 Fed.Reg. 22536 (1973)).

8. The price control scheme described herein was codified in regulations appearing at 39 Fed.Reg. 1949 (1974). Since the period of time relevant to the facts of this case, the price control scheme has been substantially altered. On September 1, 1975, the FEA amended its regulations to provide for the gradual decontrol of crude oil prices, 40 Fed.Reg. 31747 (1975). The scheme was revised by Section 401(a) of the Energy Policy and Conservation Act, Pub.L. No. 94–163, 89 Stat. 941, 15 U.S.C. § 757 (Supp. V 1975), which became effective on February 1, 1976. Under regulations adopted pursuant to this Act, both tiers of crude oil prices are controlled, rather than one tier being allowed to float freely (*see* 42 Fed.Reg. 3635 (1977). Thus, the regulations have been revised further (*see* 10 C.F.R. Part 212 (1977)).

the same postings for exempt oil (J.A. 414). At this time, Conoco used a "weighted average" which reflected the relative amounts of old and exempt oil actually refined at the Denver refinery.[9] Conoco now concedes that use of the weighted average was improper under the strict terms of the contract.[10] It does insist, however, that the contract entitles Conoco to refer to price postings for exempt oil in the formula used to calculate the price for jet fuel. North Central paid the amounts assessed by Conoco and brought the instant action in the United States District Court for the District of Columbia on August 29, 1974.

## II. THE PROCEEDINGS IN THE DISTRICT COURT

After North Central initiated the district court action, the parties filed cross-motions for summary judgment. On April 11, 1975, the court granted North Central's summary judgment motion. Upon Conoco's motion for reconsideration, which argued that there was a disputed question of fact regarding the meaning of the term "posted price," the court, on September 22, 1975, rescinded its April 11, 1975 order and directed that a hearing be held to determine the meaning of "posted price." This hearing was held on April 12–13, 1976. Thereafter, North Central's motion for summary judgment was granted pursuant to a memorandum, opinion, and order filed July 27, 1976.

In support of its order of summary judgment for the plaintiff, North Central (J.A. 16), the district court's Memorandum and Opinion (J.A. 10–15) declared that the contract's reference to "posted price" embraced only the price for old oil (J.A. 14). After fully endorsing plaintiff's interpretation of the term "posted price," the court concluded that no material issue remained and that therefore plaintiff was entitled to judgment as a matter of law. The court acknowledged that no dispute concerning the meaning of the contract term "posted price" existed until the federal regulation of oil prices began, and that the creation of the two categories of oil—old and exempt—was what caused the meaning of posted price to become ambiguous. Illustrative of the court's approach is the following passage:

> The express words of the contract clearly indicate that "posted price" was to be the standard by which price increases and decreases were to be determined. And it is undisputed what "posted price" meant at the time the contract was written including the term in the escalation clause. Defendant's position is simply that the two-tier pricing system which was created by federal price controls changed the meaning of "posted price" as used in the contract. However, the course of performance between the parties and significant practice in the oil industry indicated to the contrary. Although federal regulation of prices created havoc in the historically stable pricing structure for products in the oil industry, it did not change the meaning of "posted price" as used in this contract.

J.A. 14.[11]

█ In the usual case, it is the role of this court upon an appeal from an order

---

9. The weighted average formula reflected the weighted average cost of escalation crude oil used at the refinery producing aviation fuel for North Central. Since the Denver refinery was largely using exempt crude (about 94%), Conoco calculated a contract price which weighted the price for exempt oil at nearly 94% and the price for old oil at slightly over 6% (J.A. 414–A, 478–79). The method was suggested by two other airline customers (J.A. 333).

10. Conoco Reply Br. at 1. In view of our construction of the contract, it is unnecessary to determine whether Conoco's concession is demanded by the language of the contract. *See* note 23 *infra* and accompanying text.

11. Plaintiff argued that Conoco's use of a weighed average to compute the contract price was improper. In addressing this issue, the court made the following statement:

> The Court is not persuaded by Defendant's argument that the federal price controls rendered the escalation provision inoperable thus mandating the imposition of a "reasonable price." U.C.C. § 2–305(1)(c), D.C.Code 28:2–305(1)(c). It is clear that permitting North Central to receive oil at a price based upon the posted price of what came to be

granting summary judgment to determine whether there is any genuine issue of material fact underlying the adjudication, and, if not, whether the substantive law was correctly applied. *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 114, 479 F.2d 201, 206 (1973). The proceedings in this case, however, do not lend themselves to ready application of the general rule. Here, the district court ordered a separate trial of the issue of whether the price bulletins for exempt oil constituted "posted prices," as that term was used in the contract.[12] Then, after a trial on this separate issue, the court decided, in light of its findings on that issue,[13] that no material issue of fact remained in the case and that summary judgment was appropriate.

Upon review of the result reached in this "hybrid" proceeding, it is our view that the validity of the court's findings on the factual issue which was the subject of the separated trial should be considered first. These findings are, of course, tested against the "clearly erroneous" standard articulated in Fed.R.Civ.P. 52(a).[14] Such an approach is the most efficacious in this case, since if we find that the court's findings on the separate issue are clearly erroneous, then *a fortiori* the grant of summary judgment would be improper, as that judgment hinged on the validity of the factual findings. If we should affirm the court's factual findings, the task of testing the summary judgment by the well-settled principle referred to above would remain.

## III. THE DISTRICT COURT'S FINDINGS ON THE ISSUE OF POSTED PRICE

This case turns upon the meaning of "posted price." As discussed above, the

termed "old" oil even though Conoco was forced to purchase "new" oil at significally [*sic*] higher prices created a result inequitable to Conoco because Conoco could not charge North Central accordingly. However, the contract does not in any way contemplate nor permit the "equitable" system devised by Conoco to pass through these increased costs to North Central.
J.A. 15.

12. While appellant does not base its appeal upon procedural infirmities in the district court proceedings, it nevertheless criticizes the procedures at length, characterizing them as "an impermissible hybrid of summary judgment and trial procedures." Reply Br. at 14–15. We note that bifurcated proceedings are not always appropriate, in that such division in certain cases might complicate rather than simplify the issues, particularly upon review. Yet we do not perceive a substantial objection in appellant's criticism of this particular method of bifurcation.

The district court is authorized by Fed.R. Civ.P. 42(b) to separate *issues* from the remainder of the case in proper circumstances. That rule provides as follows:

The court, *in furtherance of convenience* or to avoid prejudice, or when separate trials will be *conducive to expedition and economy*, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or *issues*, always preserving inviolate the right of trial by jury

(Emphasis added). The separate issue which the court addressed here involved the most critical question in the litigation and was a very appropriate subject for bifurcated consideration.

13. In a trial before a court without a jury, the findings of fact and conclusions of law that the court is required to make, Fed.R.Civ.P. 52(a), are sufficient if they appear in an opinion or memorandum filed by the court, *id.* It is our view that the findings of fact on the issue of "posted price," an issue which was separated from the remainder of the case for special attention, do appear in the court's memorandum and opinion. That opinion explains why the court concluded that the "price bulletin" for exempt oil did not constitute a "posted price" within the meaning of the contract. That discussion satisfies the requirements of Rule 52(a).

14. "[A] finding is 'clearly erroneous' if it is without substantial evidentiary support or if it was induced by an erroneous application of the law. Beyond that, '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' In reviewing the trial judge's decision in this case, then, we must look to all of the evidence of record to determine whether the findings can pass muster." *Case v. Morrisette*, 155 U.S. App.D.C. 31, 38–39, 475 F.2d 1300, 1307–8 (1973); cases cited at *id.*, nn.35–39.

crucial clause in the contract ties the price of aviation fuel to prices posted by Conoco and Amoco for Wyoming Sweet Crude Oil, 40 gravity. Posted prices are not new to the oil industry nor are they unique to this contract. "Posting" has long been a practice in the oil industry. Early on, it involved the physical placement at a public location of a written statement, or "price bulletin," which listed the current price at which an oil company would purchase a barrel of a specific grade of crude oil. Producers would read the postings and would base their decision on to whom they would sell upon the prices "offered" by the purchaser. Now, price bulletins are published and circulated to interested parties, such as sellers of crude oil, customers whose products' prices are tied to or affected by the price of crude, and, among others, to *Platt's Oilgram*, a periodical of interest to members of the oil industry.

The posted price at any particular time is the offeror's best estimate of the lowest price that may be offered that will buy the quantities of crude oil needed by him. This estimate is a function of many factors. For example, in addition to reflecting the offeror's own needs, the posted price is related to changes in supplies of crude oil, changes in demand for refined products, the availability of energy substitutes, and the effects of governmental policies. Historically, posted prices have reflected the interaction of many variables.

■ The essence of the district court's findings is that the price bulletins for exempt oil did not constitute "posted prices" within the meaning of the contract. In our view, this result was clearly erroneous. We conclude that the price bulletins were posted prices within both the historical meaning of that term and the usage of the trade, and that the price bulletins were posted prices within the meaning of the contract.

After the two-tier system of crude oil pricing was adopted,[15] the Cost of Living Council defined "posted price" as follows:

> "Posted price" means a written statement of crude oil prices circulated publicly among sellers and buyers of crude oil in a particular field in accordance with historic practices and generally known by sellers and buyers within the field.

38 Fed.Reg. 33578 (1973), *codified at* 10 C.F.R. § 212.31 (1976). Prior to the implementation of two-tier pricing, the price bulletin consisted of a notice which announced that the issuer, an oil company, would pay the prices for particular grades of crude oil set forth in the bulletin. Typically, the charts were divided into columns; the left-hand column listed the various gravities. Each of the other columns was assigned to a particular type of crude oil, e. g., Central Montana Sour, Wyoming Sweet, North Texas Intermediate, etc. By locating on the chart the intersection of the gravity and the type of oil, the seller could determine the price the oil company would be willing to pay for any particular gravity of any particular type of crude oil. *See* J.A. 412, 413. After the effectuation of two-tier pricing, oil companies eventually issued price bulletins for both old and new oil. The only difference between these bulletins was the heading; the exempt oil bulletin identified the notice as such. Similarly, the companies issued statements for old oil prices, which recited the levels at which the government had frozen the prices. Except for the hearings on these notices, these bulletins were identical in form to the bulletins for exempt oil and for oil prior to the two-tier pricing system. *See, e. g.,* J.A. 415, 416, 469. While the district court did not specifically find that the bulletins issued prior to two-tier pricing were "posted prices,"[16] this conclusion is beyond serious

---

**15.** As noted earlier, the two-tier price system was implemented on August 19, 1973 (38 Fed. Reg. 22536 (1973)). These regulations did not contain a definition of "posted price." The amendments announced on November 30, 1973 did contain such a definition (38 Fed.Reg. 33578 (1973)).

**16.** That pre-two tier prices were posted prices is implicit from the district court's opinion. The court stated "[t]here w̄as no dispute between the parties as to the meaning of 'posted price' until the federal regulation of oil prices." J.A. 11. Presumably, the court means that the

dispute. These notices were the written statements which, as the FEA described them, were circulated publicly in accordance with historic practices among sellers and buyers of crude oil. Both types of bulletins circulated after the advent of two-tier pricing served precisely the same function. In these respects, the two types of bulletins—both for old oil and for exempt oil—meet all the essential requirements for a posted price.

Subsequent FEA pronouncements on posted price demonstrate that price bulletins for exempt oil are indeed considered "posted prices." These pronouncements, issued during the period of two-tier pricing, did not even intimate that government regulation had changed the posted price system in any respect. *E. g.*, 42 Fed.Reg. 3628, 3635 (1977). Indeed, FEA regulations under the Energy Policy and Conservation Act, Pub.L.No.94–163, 89 Stat. 941, 15 U.S.C. § 757 (Supp. V 1975), which set a price ceiling on exempt oil as well, were expressed in terms of "posted prices." The regulation stated: "The upper tier ceiling price for a particular grade of domestic crude oil in a particular field is (1) *the highest posted price on September 30, 1975* . . . less (2) $1.32 per barrel." 41 Fed. Reg. 4940 (1976), 10 C.F.R. § 212.74 (1976) (emphasis added). Thus, it is clear that the FEA treated the price bulletins for exempt oil during two-tier pricing as posted prices.

In its attempt to demonstrate that price bulletins for exempt oil were not posted prices, plaintiff produced an expert witness who offered an interpretation of the CLC definition which, if valid, would add un-

usual content to the plain meaning of the language. This witness testified that the phrase "historical practices" embraced a large number of factors—government intervention in the market; stability of prices; etc.—not specifically mentioned in the regulation (J.A. 159). This witness stated that without the existence of these latent elements, a posted price could not exist. From this conclusion, the witness reasoned that some of these factors were not reflected in the price bulletins for exempt oil—*e. g.*, the prices for exempt oil escalated rapidly, were not stable, and hence these bulletins could not be posted prices.[17]

The purpose of the regulation's reference to "historical practices" is to give content to the language "circulated publicly," *i. e.*, the circulation of the written statements. At any early date, as discussed above, the price bulletins were tacked onto trees or whatever could be found in the fields; hence, the term "posted" price developed. The prices contained in the statement were "circulated" when the sellers visited the fields to find out the prices. Now, these prices are circulated in far more efficient ways. In the regulation, "historical practices" refers to the *manner of circulation*. By this rudimentary analysis, it cannot be said that the prices issued in the written statements for old and exempt oil are not posted prices. Furthermore, the conclusion that the CLC definition when properly interpreted embraces price bulletins for exempt oil is fully supported by subsequent FEA pronouncements on its own definition.[18]

---

price bulletins for crude oil before pre-two-tier pricing were posted prices.

**17.** J.A. 137–39. Respondent also urges that because some exempt oil postings have been applied retroactively, they are unlike the historical concept of a posted price and therefore should not be deemed a posted price within the meaning of the contract (Br. at 24–25; J.A. 162–64; *contra*, J.A. 291–92). The evidence in the record indicates that historically some prices were posted retroactively (J.A. 290–91, 271); thus, there is no valid basis on this ground for distinguishing exempt oil postings from pre-two tier postings. That retroactive pricing should occur is not particularly surpris-

ing: the purchaser has a need to meet and maintain his future supply relationships. Thus, the purchaser would, in some cases, have to meet other posted price increases from the time they become effective, lest the purchaser lose his supply sources. (J.A. 242–43, 244, 271, 295, 312–13). This would be a likely occurrence in any rising market (*see* J.A. 243).

**18.** North Central argues that *Platt's Oilgram* did not publish prices for exempt oil, and uses this fact to argue that the price bulletins for new oil were not posted prices within the meaning of the contract. Br. at 21. We are not persuaded that the failure of a periodical to list a price means that the price is not posted.

In short, the only permissible conclusion from the evidence in the record is that the prices posted for exempt oil are "posted prices."[19] From this conclusion, it is but a small step to the realization that these prices are "posted prices" as that term is used in the contract.

When the parties entered into this contract, it is true that they did not foresee that the government would institute a system of two-tier oil pricing. They drew a contract which had as its underlying rationale the fact that the price to be paid by North Central would fluctuate in proportion to the cost of Conoco for their crude. They did not expect a separate posting for old oil any more than they expected a separate posting for exempt oil. It was this fact which led the district court to comment that "it is undisputed what 'posted price' meant at the time the contract was written including the term in the escalation clause." (J.A. 14). But from that point the court reasons incorrectly: "Defendant's position is simply that the two-tier pricing system which was created by federal price controls changed the meaning of 'posted price' as used in the contract . . . .. federal regulation of prices . . . did not change the meaning of 'posted price' as used in this contract." (*Id.*) We believe the court mis-

apprehended the nature of Conoco's argument. It is true that two-tier pricing did not change the meaning of posted price: prices were still circulated through bulletins in the same way that they were circulated in the past. The difference was that now *two prices* were posted for each grade of crude oil, whereas only one price had been posted before.

Confronted with two posted prices where the parties only contemplated one, the district court concluded that only the price bulletin for old oil was a posted price within the meaning of the contract. This, in our view, is error. The language of the contract referred to posted price; but prices published for old and exempt oil were *both* posted prices, and it was error to rely upon one posted price to the complete exclusion of the other.

North Central argues to this court that the contract does not provide for more than one "posted price" per referenced company. Thus, by this argument, *either* the price for old oil *or* the price for exempt oil must be used as the standard; the prices for both cannot be used. But since both are posted prices, some substantial reason must exist why one price should be used to the exclusion of the other. After studying appellee's argument, we perceive no logical basis for

Indeed, the "Price-Control Notice" published in *Platt's* (J.A. 543) does not refute the argument that exempt oil postings are in fact posted prices, but only indicates that *Platt's* is not publishing the prices circulated for new oil.

Of course, had the parties' contract used as a standard the posted price "as reported in *Platt's Oilgram*," another case would be presented. See *Eastern Air Lines v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D.Fla.1975), discussed in text at —— of 187 U.S.App.D.C., at 591 of 574 F.2d, *infra*.

**19.** North Central also argues that a usage of the trade supports the proposition that "posted price" refers only to the price for old oil. Specifically, North Central points to record evidence that the industry viewed "new oil" as a temporary phenomenon (Br. at 19). This does not refute the conclusion that price bulletins for new oil are in fact posted prices. North Central also points to *Platt's Oilgram* as a usage of the trade (Br. at 19–20). This is discussed at note 18, *supra*. North Central points to Conoco's statement at meetings in January, 1974 that it could not increase product prices

based on increases in the price of new oil (Br. at 21). This only restates the fact that Conoco would not compute a price based on exempt oil when it had not yet posted a price for that oil. North Central argues that new oil prices were set in terms of a premium over the posted price of old (Br. at 21–22). This is flatly contradicted by the examples of postings for new oil in the record (e. g., J.A. 415, 416); the fact that some of these postings may have been called "premiums over old" is without significance. North Central points to the fact that oil companies in exchanges among themselves would use the price for old oil (Br. at 22). This is without significance, as exchanges of like kinds are most probably going to be based on the simplest unit of exchange to simplify accounting procedures. Finally, North Central makes a point about Conoco's dealings with other airlines (Br. at 20–21, 31). These few references are not adequate to create a "usage of trade," and in any event would not control us where the issues can be resolved by reference to the document in question.

excluding either posted price from consideration. Moreover, substantial record evidence does not exist to support the conclusion that the price for old oil should be used to the exclusion of the price for exempt oil. In short, we reject North Central's suggestion that this court must choose one price or the other. The contract says "posted price," and there is no basis for choosing one price bulletin to the complete exclusion of the other.

The district court indicated that the "course of performance" of the parties during the period of two-tier pricing demonstrates that even the parties believed that only prices for old oil constituted a posted price. This conclusion does not fairly reflect the course of negotiations between the two parties. It is true that Conoco did attempt to induce North Central to agree voluntarily to a price increase (J.A. 323–27, 417–18). In fact, other airlines did agree to Conoco's requests (J.A. 327). And it is true that Conoco for a certain period of time assessed North Central at rates computed with reference to the price for old oil, even though the two-tier system was officially in operation. However, the reason Conoco did not at that time charge North Central a price computed with reference to exempt oil prices is that Conoco had not *posted* prices for exempt oil. Conoco held off posting prices for exempt oil because it believed the government's program was ill-conceived and would not last long (J.A. 299–300, 322). Conoco did request that the airlines submit to price increases, but during this period, prices were escalating rapidly and Conoco was pricing below costs. It was not until March, 1974, that Conoco did post a price for exempt oil (J.A. 312, 330). It was not until this time that Conoco had a price bulletin which met the contractual requirement that the price for aviation fuel be set with reference to the posted price for crude oil. Conoco did not attempt to assess a higher price when the contract did not authorize it to do so. There is nothing here that demonstrates a course of performance whereby Conoco consented, acquiesced, or encouraged reliance upon the posted price for old oil only. In fact, correspondence from North Central during this period does not even contain assertions that exempt oil prices posted by Amoco or Conoco were not posted prices within the meaning of the contract (e. g., J.A. 476, 477).[20]

*Eastern Air Lines v. Gulf Oil Corp.*, 415 F.Supp. 429 (S.D.Fla.1975) differs from this case. In *Eastern Air Lines*, the contract's price escalation indicator was the price listed in *Platt's Oilgram Crude Oil Supplement. Platt's* listed only the price for old oil; it did not list the price for new oil. The language of the contract, in the view of the court, was clear and unambiguous: it said that the prices listed in *Platt's* would be used. Because *Platt's* only posted one price, the parties were required by contract to refer to that price. If *Platt's* had posted two prices for oil, one for old oil and one for exempt oil, this case would be presented. The contract between North Central and Conoco refers to posted price, and here there is more than one posted price for the grade of crude used by each company. The language of this contract does not proscribe referring to the posted price for exempt oil, unlike *Eastern Air Lines* where the contract foreclosed looking to the price for exempt oil because that price was not posted in *Platt's*.

---

**20.** A similar factual issue was presented in *Asamera Oil (U.S.), Inc. v. Husky Oil Co. of Delaware*, No. 75–F–430 (D.Col. Jan. 20, 1977). In *Asamera*, the contract provided that the price of crude oil would vary with the arithmetical average for like grade and gravity of crude oil in accordance with the crude oil price bulletins of the Continental Oil Co. and the Atlantic Richfield Co. "as amended from time to time." After the advent of two-tier pricing, Conoco and Arco each began to publish bulletins for old and new oil. The court found that the contract language required the inclusion of postings for both old and new oil in the price setting formula, and that any other interpretation would be inconsistent with the intent of the parties. The court stated:

> [W]e hold that the contractual reference to Crude Oil price Bulletins of major oil companies, a well-recognized industry practice, incorporates price bulletins for both old and exempt or new crude oil that were subsequently posted by those companies.

Tr. at 26.

We hold that the price bulletins for new or exempt oil were posted prices within the meaning of the contract. To the extent that the district court's findings are inconsistent with this holding, those findings are reversed.

## IV. THE VITALITY OF THE PRICE ESCALATION CLAUSE

Our holding that price bulletins for new or exempt oil are posted prices within the meaning of the contract does not answer the question of the proper price to be charged North Central for its aviation fuel. To resolve this issue, it is necessary to look first to the language of the contract. We conclude that the contract's price determination mechanism, the standard to which the parties agreed when only "one-tier oil pricing" existed, is so indefinite in the context of two-tier pricing that it cannot be applied.

Because this contract was written when only one category of oil existed, the parties contemplated when they drafted the price escalation clause that only *two posted prices* would be submitted to the arithmetic averaging formula. This was the *agreed standard* which was to be used to set the contract price. Now there are two categories of oil, and there are consequently two classes of posted prices, each different from the other. The agreed standard—a single arithmetic average of two posted prices—no

longer exists, as there are now four posted prices. The applicable statute is section 2–305(1) of the Uniform Commercial Code [21] which provides:

The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a *reasonable price* at the time for delivery if

(a) nothing is said as to price; or

(b) the price is left to be agreed by the parties and they fail to agree; or

(c) the price is to be fixed in terms of *some agreed* market or other *standard* as set or recorded by a third person or agency *and it is not so set* or recorded.

(Emphasis added).

Because the agreed standard, a single "arithmetic average price" computed from two posted prices for "Wyoming Sweet Crude Oil," no longer exists, it necessarily follows that the price in this case was not set by the agreed standard. The Code requires that when the agreed standard fails, a reasonable price is substituted, leaving the contract to be enforced according to its remaining terms.[22] While it might be possible, using the terms contained in the escalation clause, to fashion a contract price based on an arithmetic average, such an exercise would amount to pure speculation: the contract does not prescribe the manner in which the average should be taken when two-tier pricing exists.[23] While the lan-

21. D.C.Code § 28:2–305(1) (1973); Colo.Rev. Stat. § 4–2–305(1) (1974).

22. North Central argues that throughout the period in question, a "posted price" existed, *i. e.*, the price for old oil, and hence the contract's price mechanism has not failed (Br. at 32–34). This argument gives inadequate attention to the language of section 2–305(1) of the Uniform Commercial Code. The focus of the proper analysis in this case is not on whether a posted price exists but is on whether *the agreed standard sets the price.* A finding that posted prices existed throughout the period in question is not inconsistent with the finding that the agreed standard became inapplicable when the number of posted prices increased.

23. The operation of the price escalation clause is clear in the context of one-tier pricing: whenever an average price is computed (either for determining the base price or for determin-

ing incremental changes in the base price), the single arithmetic average of the two posted prices is taken. That is the only plausible averaging technique in this setting. This clear, definite clause becomes indefinite and unworkable when the number of posted prices is increased. For example, the literal language does not foreclose taking an arithmetic average of all four posted prices; but unless equal amounts of old and exempt oil were used in the refined jet fuel the result would do violence to the underlying pricing theory that the parties agreed to in the contract, *i. e.*, pass through the increased cost of the crude oil refined. On the other hand, because the term "arithmetic" is used only with reference to "base price" and is not used in the sentence which contains the formula for computing increments in the base price, the language does not foreclose taking separate arithmetic averages for old oil and exempt oil prices, followed by weighted averaging of those

guage chosen by the parties constitutes strong evidence both of the intent of the parties and of what price is reasonable, this evidence is not enough, in view of the applicable statute, to make an indefinite price term capable of enforcement.

## V. THE RESPONSIBILITY OF THE DISTRICT COURT UPON REMAND

█ The task of the district court upon remand is to determine what is the "reasonable price" for the aviation fuel which is the subject of the contract. In this inquiry, the court should take into account that the parties intended to establish an escalation clause which would pass through some of the costs of the raw material by increasing the price of the refined product in a definite relationship to any increase in the posted price of certain crude oil.

When aviation fuel is refined from crude oil, some of which has one price and the remainder of which has another price, it would seem that in fashioning a reasonable price the basic underlying intent of the contract would be effectuated if the quantity of jet fuel refined from each category of crude oil was priced according to the arithmetic average posted price of that crude.[24] Thus, if it could be determined how much aviation fuel was refined from old oil, the price for that fuel should be set at the arithmetic average of the two posted prices for old oil. The same methodology should apply to the price for fuel produced from exempt oil. From our limited consideration of this aspect of the problem, such result would constitute a reasonable price under the circumstances; it would carry out the pricing formula upon principles similar to those agreed to by the parties in the first instance. By this analysis, it would be unreasonable to use an arithmetic average of

all four posted prices, because, unless equal quantities of old and exempt oil were refined to produce the jet fuel, either the purchaser or the seller would receive a windfall inconsistent with the underlying principle that the price should be related to the underlying cost of the crude oil. We recognize that market factors for aviation gasoline might intrude and cause a price computed in the foregoing manner to be found unreasonable, in which event a reasonable price would have to be arrived at by other means.

Evaluation and resolving this issue is the responsibility of the district court upon remand. Determining what is a reasonable price under these circumstances necessarily requires that the question of damages be reconsidered.

## VI. CONCLUSION

For the reasons expressed in the foregoing opinion, we hold that the price bulletins for exempt oil were posted prices within the meaning of the contract. To the extent that the district court's findings are inconsistent with this holding, these findings are vacated. Summary judgment for North Central is vacated, and the case is remanded to the district court for proceedings not inconsistent with this opinion.

*Judgment accordingly.*

---

two averages to reflect the quantities of old and exempt oil used to refine the jet fuel. In our view, the contract language does not conclusively point to any particular averaging technique to be used in such circumstances. Thus, because the language of the price escalation clause does not contain a clear, definite directive as to which course to follow, the clause fails to set a price and a reasonable price must be substituted.

**24.** It would be up to the district court on remand to determine whether to look only to the Conoco refinery serving the Denver airport or to the average of all Conoco refineries producing aviation fuel should the court decide to examine the relative amounts of old and exempt oil making up the raw material for such fuel.