636 P.2d 116

**Samuel C. PAYNE and Marie Rita Payne, husband and wife, Plaintiffs-Appellants,**

v.

**M. GREENBERG CONSTRUCTION, a corporation; Bergen-Starr Equipment Company, Inc., an Arizona corporation, dba Starr Company now known as Bistro-Starr Equipment Company Inc.; John Doe I and Jane Doe I, dba Starr Company; John Does II through X; Jane Does II through X; and White Corporation I through V inclusive, Defendants-Appellees.**

No. 1 CA–CIV 4668.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 25, 1981.

Rehearing Denied Oct. 21, 1981.

Review Denied Nov. 10, 1981.

8. Set forth at page 113, *supra*.

Hocker, Yarbrough & Gilcrease by R. Kelly Hocker, Tempe, for plaintiffs-appellants.

Maupin & Wilson by Donald R. Wilson, James William Junker, Phoenix, for defendant-appellee M. Greenberg Const.

Snell & Wilmer by Donald M. Peters, John J. Bouma, Ted Thayer, Phoenix, for defendant-appellee Bistro-Starr Equipment Co.

## OPINION

CONTRERAS, Judge.

Appellants brought suit against appellees Bistro-Starr Equipment Co. (Starr), M. Greenberg Construction (Greenberg) and others for damages in connection with injuries suffered by appellant Samuel C. Payne (Payne) as a result of the collapse of a scaffold upon which he was working. This appeal is from summary judgment in favor of Starr and a directed verdict in favor of Greenberg. We find no error and affirm.

Payne was injured on January 15, 1973, when a scaffold upon which he was working collapsed causing him to fall approximately 20 feet to a concrete floor. This injury occurred during the construction of a National Guard helicopter hangar in Phoenix, Arizona. Greenberg was the general contractor for the construction of this facility and had subcontracted the electrical work to Code Electric Company (Code), Payne's employer.

As a part of the construction of the hangar, it was necessary to install an overhead crane. Greenberg contracted with Starr for the purchase and installation of the crane which was to be placed between two long I beams attached to the roof trusses which ran the length of the hangar. To facilitate the installation of the crane, Starr rented the component parts of a scaffold from Action Equipment and Scaffold Company, Inc. (Action).[1] Employees of Starr erected the scaffold and installed the crane.

After the crane was installed, a question arose as to whether Starr's employees or Code's employees would do the electrical wiring of the crane. This work was not part of the original agreement between Greenberg and Code. Greenberg ultimately entered into an agreement with Code which authorized Code to do the wiring.

Several days before Code began the electrical wiring of the crane, Code's foreman, Jimmy Hair, and Greenberg's construction superintendent, George Lewitz, had a conversation regarding how Code employees would reach the crane to wire it. There was a dispute at trial over this conversation. Both Hair and Lewitz testified that Hair asked Lewitz about using Starr's scaffold, and that Lewitz indicated the scaffold was not Greenberg's property. Nonetheless, Hair testified that Lewitz told him to use the scaffold; Lewitz testified that he told Hair to get Starr's permission to use the scaffold. It was undisputed that neither Hair nor Lewitz sought permission from Starr to use the scaffold.

Using the scaffold, Hair and Payne began the electrical work on the crane. The scaffold was on casters, enabling Hair and Payne to move it as they worked along the length of the crane. Prior to the accident, both men had worked on the scaffold approximately one and one-half to two and one-half days without experiencing any significant problems. On the day of the accident, while attempting to install a bracket, Hair exerted pressure along the scaffold's handrail. As he did so, he felt the scaffold move. Hair testified that he looked down and saw that a caster had dropped out of the scaffold's tubular frame. Hair descended the scaffold and attempted to reinsert the caster while Payne remained atop and

1. Payne also brought suit against Action and the State of Arizona. The State of Arizona was dismissed from the litigation and a directed verdict was entered in favor of Action. Neither the State of Arizona nor Action are parties to this appeal.

attempted to brace the scaffold by clinging to the hangar's iron work. Hair was unable to reinsert the caster or to brace the scaffold in any other manner. The scaffold started to fall and Payne released his grip from the iron work. Payne then attempted to exit from the end of the scaffold and push himself away from it, but his tool pouch caught in the scaffold's handrail. As a result, Payne fell to the floor of the hangar and was injured.

## JURISDICTIONAL ISSUE

We first consider a jurisdictional issue raised by appellee Starr.

Summary judgment was entered before trial in favor of Starr on November 5, 1976. The judgment did not contain language making it a final appealable order pursuant to civil rule 54(b).[2] It was not until May 25, 1978, when the court entered judgment granting Greenberg's motion for directed verdict and certifying it as a final appealable order that the judgment for Starr became final. In order to be timely, a notice of appeal had to be filed no more than 30 days after the May 25, 1978, judgment unless time-extending motions were filed as provided in appellate rule 9.

Payne filed a timely motion for new trial on June 8, 1978, pursuant to civil rule 59. This motion extended the time for appeal for purposes of appellate rule 9(b).[3] This motion was served upon Greenberg and Action, the defendants who had participated in the trial, but it was not served upon Starr. It is Starr's contention that this lack of service rendered the motion for new trial ineffective to extend the time for appeal as to Starr.

Civil rule 59(d) requires that a motion for new trial be filed not later than 15 days after entry of judgment. It does not refer to service. However, civil rule 5(g) requires that:

> Except for offers of judgment under Rule 68, all papers after the complaint required to be served upon a party or to be filed with the court within a specified time shall be *both filed with the court and served* within that specified time.

(emphasis added). Thus, a timely filing under appellate rule 9(b) of a time-extending motion requires timely service. In addition, civil rule 5(a) provides in part:

> Except as otherwise provided in these rules, ... every written motion other than one which may be heard ex parte, and every written notice, appearance, demand, offer of judgment, designation of record on appeal, and similar papers shall be *served upon each of the parties.*

(emphasis added).

Payne's failure to serve Starr with the motion for new trial violated civil rule 5. We must determine whether this failure rendered the motion ineffective to extend the time to appeal the judgment previously entered for Starr. If the motion for new trial was ineffective, Payne's November 13, 1978, appeal was untimely and this court is without jurisdiction to entertain the appeal. *Edwards v. Young*, 107 Ariz. 283, 486 P.2d 181 (1971).

In making this determination we must read civil rules 5 and 59 in conjunction with civil rule 54(b) which provides in part:

> [A]ny order or other form of decision, however designated, which adjudicates

2. The Arizona Rules of Civil Procedure, 16 A.R.S., will be referred to as the civil rules. The Arizona Rules of Civil Appellate Procedure, 17A A.R.S., will be referred to as the appellate rules.

3. Appellate rule 9(b) provides in part:

When any of the following motions are timely filed, the time for appeal is extended, and the times set forth in Rule 9(a) shall be computed from the entry of any of the following orders:

(1) Granting or denying a motion for judgment notwithstanding the verdict pursuant to Ariz.Rules Civ.Proc. 50(b);

(2) Granting or denying a motion to amend or make additional findings of fact pursuant to Ariz.Rules Civ.Proc. 52(b), whether or not granting the motion would alter the judgment;

(3) Granting or denying a motion to alter or amend the judgment pursuant to Ariz. Rules Civ.Proc. 59(1);

(4) Denying a motion for new trial pursuant to Ariz.Rules Civ.Proc. 59(a).

fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

In 6 Moore's Federal Practice ¶ 54.01[1], at 33, 35 (2d ed. 1976), it is pointed out that:

Under amended Rule 54(b), the action involving multiple claims is in its entirety a judicial unit. . . .

. . . .

[U]ntil the [court] adjudicates *all* of the multiple claims, or the rights and liabilities of *all* the parties, any adjudication of one or more but fewer than all of the claims, or of the rights and liabilities of fewer than all of the parties, is interlocutory. . . .

(emphasis in original). Thus, if the motion for new trial is effective to extend the finality of judgment as to *any* of the parties, it is effective to extend the time for appealing all orders and rulings which are assigned as error. *Dean v. Powell*, 111 Ariz. 219, 526 P.2d 1241 (1974); A.R.S. § 12–2102; *see Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980).

Both filing and service were timely as to Greenberg, and Starr does not contend that the motion for new trial was ineffective as to Greenberg; Starr contends it was ineffective only as to Starr. Under the procedural sequence in this case, Starr would have us take the position that Payne should have filed an appeal as to Starr within 30 days of the May 25, 1978, judgment but have until 30 days after the disposition of the motion for new trial to appeal the judgment as to Greenberg. We find this position untenable. This is precisely the type of piecemeal litigation that rule 54(b) was designed to preclude.

■ We therefore conclude that because the motion for new trial was timely filed

and served on Greenberg, the time to appeal the summary judgment in favor of Starr was tolled. Although it is clear that Payne failed to comply with civil rule 5(a), an action we do not condone, it does not deprive this court of jurisdiction over this appeal.[4]

SUMMARY JUDGMENT FOR STARR

Payne alleged that Starr employees improperly erected the scaffold or maintained it knowing that the scaffold was not properly constructed and was inherently dangerous. Starr moved for summary judgment on the grounds that Payne was a trespasser to whom Starr's only duty was not to intentionally or willfully injure him. Alternatively, Starr argued that at most Payne was a licensee to whom Starr owed a duty to protect from hidden perils. Starr further claimed that since there was no evidence of intentional injury or evidence that Starr had knowledge of any defect in the scaffold, it was entitled to judgment as a matter of law.

In response to Starr's motion for summary judgment, Payne alleged alternatively that: (1) he was an invitee to whom Starr owed a duty as a donor or lender of a chattel known to be dangerous pursuant to the Restatement (Second) of Torts §§ 388, 392, 405 (1965); or (2) he was at least a licensee to whom Starr owed the duty of protection from hidden perils; or (3) even if he were a trespasser, he was a known trespasser, and the scaffold was an artificial condition highly dangerous to known trespassers to whom Starr owed a duty pursuant to the Restatement (Second) of Torts § 337 (1965). In addition, Payne now argues on appeal that this court should overlook the fine distinctions between invitees, licensees, and trespassers for purposes of imposing liability where there is an injury to construction workers.

■ Before considering those issues which Payne raised at the trial court in

---

**4.** Had Starr alleged that prejudice occurred as a result of Payne's failure to comply with rule 5(a), some remedial action might be appropriate. Since we do not have such a situation before us, we will not speculate as to the nature of such remedy.

response to Starr's motion, we will first dispose of Starr's assertion on appeal that Payne's status should be held irrelevant for purposes of liability. Arizona is among those jurisdictions which have long recognized differences in duties owed by land owners toward invitees, licensees and trespassers. *E. g., Spur Feeding Co. v. Fernandez*, 106 Ariz. 143, 472 P.2d 12 (1970); *Shannon v. Butler Homes, Inc.*, 102 Ariz. 312, 428 P.2d 990 (1967); *Barry v. Southern Pac. Co.*, 64 Ariz. 116, 166 P.2d 825 (1946). In addition, the Restatement (Second) of Torts (1965) incorporates status in defining liability of chattel owners. For example, Comment a to § 388 states in part: [5]

In the cases thus far cited, the rule stated in this Section has been applied only in favor of those who are injured while the chattel is being used by the person to whom it is supplied, or with his consent. In all probability the rule stated would not apply in favor of a thief of the chattel, or one injured while the thief is using it. Nor would it apply, for example, in favor of a trespasser who entered an automobile and was injured by its condition.

Arizona is committed to determining duty with reference to status of the injured party as invitee, licensee, or trespasser and follows the Restatement unless there is authority to the contrary. *See Jesik v. Maricopa County Community College District*, 125 Ariz. 543, 611 P.2d 547 (1980). Whether our supreme court precedent should be su-

perseded is a question for that court. *Shell Oil Co. v. Christie*, 125 Ariz. 38, 607 P.2d 21 (App.1980). Therefore, we find these distinctions determinative of the duty owed by Starr to Payne when he utilized Starr's scaffold. We therefore consider whether the record presents a factual dispute relative to a determination of Payne's status.

■■ In this appeal from summary judgment we must view the evidence in the light most favorable to Payne, the party against whom the motion was directed. *Nationwide Mutual Insurance Co. v. Granillo*, 117 Ariz. 389, 573 P.2d 80 (App.1977). At the same time, the scope of our review is limited to the evidence presented to the trial court when the motion was heard and we do not consider any evidence later introduced in the trial of this matter. *Cimino v. Alway*, 18 Ariz.App. 271, 501 P.2d 447 (1972); *see Limberopoulos v. Tom Fannin and Associates*, 17 Ariz.App. 35, 495 P.2d 475 (1972).

■ Payne admits that the evidence is clear that neither he nor his foreman sought permission from Starr to use the scaffold; however, he claims he was an invitee because his presence on the scaffold was "for a purpose directly or indirectly connected with business dealings" with Starr. *See* Restatement (Second) of Torts § 332 (1965).[6] We find guidance in interpreting the meaning of *invitee* in § 332 as it relates to the owner of a chattel from comments to the Restatement (Second) of Torts § 392 (1965).[7] This section deals with the

---

**5.** Restatement (Second) of Torts § 392, Comment a (1965), indicates that the Restatement provisions regarding suppliers of dangerous chattels are qualified by § 388, which provides in part:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the *consent* of the other or to be endangered by its probable use, ....

**6.** Restatement (Second) of Torts § 332 (1965) defines invitee as:

(1) An invitee is either a public invitee or a business visitor.... (3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly con-

nected with business dealings with the possessor of the land.

**7.** Restatement (Second) of Torts § 392 (1965) provides:

Chattel Dangerous for Intended Use
One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied
 (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or

liability of the supplier of chattels dangerous for their intended use for injuries suffered by those to whom the chattels are supplied. One basis for liability depends upon whether the chattel was supplied for the *supplier's* business purpose. Illustration three to Comment e clarifies what is meant by "supplier's business use."

> 3. A, a building contractor, contracts to erect a building for B and erects the necessary scaffold. The building having been completed according to the contract, B desires to have some additional work done on the exterior, and employs C by an independent contract between B and C. To do this work it is necessary to have the use of the scaffold. A says to C, "Here is the scaffold; you may as well use it." C's use of the scaffold in doing this additional work is not for a business purpose of A.

The record indicates that Payne used the scaffold to wire the crane pursuant to an agreement between the prime contractor, Greenberg, and Payne's employer, Code. Starr was simply another subcontractor, parallel in position to Code, whose work was essentially finished when Code commenced wiring the crane. Payne's use of the scaffold therefore was to perform a service for Greenberg, not Starr. Even if Starr had given Payne permission to use the scaffold, the record is devoid of any facts from which a reasonable inference could be drawn to support a contention that Payne was furthering a business interest of Starr. We therefore conclude that there are no facts in the record from which to conclude that Payne was an invitee of Starr's while using the scaffold.

The next issue of whether Payne was a trespasser or a licensee on the scaffold turns on whether Starr consented to Payne's presence either expressly or by its conduct. *See Barry v. Southern Pac. Co., supra;* Restatement (Second) of Torts § 330 (1965). Since Payne admits that express consent was neither sought nor obtained, Payne was required to present facts from which Starr's consent to his use of the scaffold can be inferred in order to have raised an issue that he was a licensee.

Payne relies essentially upon three portions of the record to support an inference that Starr consented to his use of the scaffold and therefore that he was a licensee: (1) testimony that Payne used the scaffold with Starr's knowledge and without objection; (2) testimony by Mr. Hair of a purported "custom" in the industry regarding the borrowing of another contractor's equipment; and (3) testimony by Max Harmon, a Starr employee, that the scaffold was left for the Code electricians to use. We will examine each of these portions of the record in turn.

In support of his first contention that there were facts before the trial court raising an inference that Starr knew and failed to object to Payne's use of the scaffold, Payne cites his own deposition testimony as follows:

> Q. To your knowledge, did anyone else, either the individuals or the contractor through his employees use the scaffolding from the time that you and Mr. Hair started to use it until the accident happened?
>
> A. Well, that is something I can't recall definitely. As I do recall it though, I remember that the crane people were in there again and climbing up on the scaffold to—checking out something and then we had a discussion that day as to how the control wiring diagrams should be and the method of locking up the electrical portion of the crane mechanism itself.
>
> Q. Who did you have that conversation with?
>
> A. Well, George was there that day and the two, the two crane men.

There is nothing in this testimony to indicate that the "crane men", presumably Starr employees, observed either Payne or his supervisor, Jimmy Hair, on the scaffold. Without more, we do not believe this testimony can support a reasonable inference that Starr through its employees knew or consented to Payne's use of the scaffold.

---

(b) if he fails to exercise reasonable care to discover its dangerous condition or charac- ter, and to inform those whom he should expect to use it.

The only other facts raised by Payne to demonstrate knowledge by Starr that plaintiff was using the scaffold was testimony relative to the presence of Code employees and Starr employees on the scaffold *after* the accident had occurred. These facts are not material to the existence of consent to use the scaffold *prior* to the accident.

Payne next argues that it was an established custom in the industry to borrow equipment without permission, and the simple failure of Starr to object warrants a reasonable belief that consent was present. However, the testimony relied upon by Payne to establish industry custom falls short of establishing such custom as a matter of law. Payne relies upon testimony by Jimmy Hair that he was accustomed to using other people's equipment without asking permission of anyone except his superintendent. Mr. Hair never testified that he was familiar with what "industry custom" was; his testimony does not purport to be more than an indication of his own habits. Further, he testified that his attitude toward borrowing is not uniformly shared in the industry:

> You can be a real horse's rear about it. Some people are that way. They won't let you borrow anything.

This testimony by Mr. Hair in itself makes unreasonable a belief that, absent objection, he had consent to use any other contractor's property. In addition, testimony with respect to a conversation which occurred between Jimmy Hair and George Lewitz indicates it was unreasonable for Mr. Hair to assume that any such custom existed with respect to the scaffold. Both Hair and Lewitz testified that they had a conversation regarding how the electricians were to reach the crane to wire it. Lewitz testified as follows:

> Jim [Hair] asked me if he could use the scaffold that belonged to Starr.
>
> I said, "*It's not mine* to loan away . . . ."

Hair's version of the conversation was as follows:

> I said, what are we going to do? I said, are we going to use that scaffold? He said, *it is not mine.* I said, it is immaterial to me.

In other regards the testimony conflicts; Lewitz claims that he advised Hair to ask Starr for permission, while Hair claims that Lewitz told him to use the scaffold. Regardless of this conflict, the two versions agreed that Lewitz stated the scaffold was "not mine." Even if Lewitz gave *his* permission, this could not reasonably be interpreted as consent by Starr when Lewitz had just denied having the authority to give such consent. Lewitz's statement, "[i]t's not mine," is reasonably interpreted to mean that Starr's consent could not be assumed.

Finally, we consider whether Max Harmon's testimony raised the issue of consent. At the time of the accident Max Harmon was a forklift mechanic for Starr. Harmon testified that it was his belief that the scaffold was being left by Starr for use by the electricians. However, this testimony is insufficient to raise a factual issue concerning consent. While it reflects Harmon's subjective belief, this belief was never expressed to anyone until his deposition was taken—long after the accident. It was never expressed to Payne or any other Code employee, since Harmon testified that as of the time of the deposition he had never met them. Therefore, this unexpressed belief cannot constitute an "act by the possessor" of the chattel justifying a belief that consent was present.

Since no facts were presented to the trial court to support an inference that Payne used Starr's scaffold with its consent, Payne must be regarded as having the status of a trespasser. The duty owed by a possessor of land to a trespasser on that land has been well defined by several Arizona cases.

The general rule is that the owner or occupier of property owes no duty to trespassers except to neither wilfully [sic] nor intentionally inflict injury upon them. *Clarke v. Edging*, 20 Ariz.App. 267, 269, 512 P.2d 30, 32 (1973); *accord, Spur Feeding Co. v. Fernandez, supra; Hersey v. Salt River*

*Valley Water Users' Association*, 10 Ariz. App. 321, 458 P.2d 525 (1969).

While conceding that there is no evidence that Starr willfully or intentionally inflicted injury upon him, Payne suggests that Starr could still be held liable even if Payne were found to be a trespasser. This argument is based upon the Restatement (Second) of Torts § 337 (1965), which imposes liability for injury to a trespasser for artificial conditions highly dangerous to known trespassers.[8] Payne contends that a scaffold is by its very nature inherently dangerous, and therefore that § 337 is applicable.

Without reaching the issue of whether a scaffold constitutes a highly dangerous condition to invoke § 337 coverage, we believe this section is inapplicable for the reasons stated in Comment a to this section:

> The rule stated in this Section relates only to the conditions under which a possessor of land is subject to liability to *a trespasser whom he knows to be about to come in contact* with a highly dangerous artificial condition maintained by him upon the land.

(emphasis added). Payne admitted that he never asked for or received permission to use the scaffold. Even under Payne's theory that there was implied consent, Payne has alleged at most that Starr had reason to know that someone might use the scaffold at some time. Even when viewed in the light most favorable to Payne, the record does not support an inference that Starr actually knew that anyone was about to use the scaffold. Therefore, § 337 is inapplicable by its own terms.

Having determined that Payne raised no facts from which it could be inferred that he was other than a trespasser and having

found that no allegation was made that Starr willfully or intentionally caused injury to Payne, we conclude that summary judgment was properly granted in favor of Starr.

## DIRECTED VERDICT FOR GREENBERG

Payne's complaint alleges that Greenberg was negligent in failing to (1) provide a safe place to work; (2) observe safety rules and regulations regarding the installation of scaffolding; (3) see that the scaffolding was properly assembled, installed and maintained; and (4) prohibit workmen from using defective equipment.

At the conclusion of Payne's case, Greenberg moved for a directed verdict upon several alternative grounds. The court granted the directed verdict on the ground that Payne had failed to present any evidence that Greenberg breached any duty that it might have owed to Payne. The court went on to note that should it send the case to the jury, the jury would be placed in the position of simply speculating whether Greenberg, through its agent, should have known about any defect in the scaffold and whether it had any opportunity to remedy the defect to fulfill any obligations it may have owed Payne.

Payne argues on appeal that because he presented evidence, presumed true for purposes of a motion for a directed verdict, which indicated that a caster had been improperly attached to the tubular frame of the scaffold, there was sufficient evidence for a jury to have inferred that Greenberg had failed to inspect or had negligently inspected the scaffold and therefore breached its duty to Payne. We disagree.

---

**8.** Restatement (Second) of Torts § 337 provides:

Artifical Conditions Highly Dangerous to Known Trespassers

A possessor of land who maintains on the land an artificial condition which involves a risk of death or serious bodily harm to persons coming in contact with it, is subject to liability for bodily harm caused to trespass-

ers by his failure to exercise reasonable care to warn them of the condition if

(a) the possessor knows or has reason to know of their presence in dangerous proximity to the condition, and

(b) the condition is of such a nature that he has reason to believe that the trespasser will not discover it or realize the risk involved.

Payne presented evidence that a caster had fallen out of the scaffold and that immediately after the scaffold collapsed, it had been noted that the rubble contained less pins than casters. It could be reasonably inferred from this evidence that the caster came off because the pin necessary to secure it was missing. However, this does not by itself demonstrate that Greenberg had failed to inspect prior to Payne and Hair's use of the scaffold, nor does it demonstrate that had an inspection occurred it was done negligently.

 The trial court correctly concluded that Payne was asking to have this matter sent to the jury as a res ipsa loquitur case. Payne's counsel admitted in argument on the motion for directed verdict that there was only circumstantial evidence of a breach of duty by Greenberg. Res ipsa loquitur is a theory of circumstantial evidence under which the jury may reasonably find negligence and causation from the facts of the accident and defendant's relation to the accident. *Jackson v. H. H. Robertson Co.*, 118 Ariz. 29, 574 P.2d 822 (1978). However, to invoke the doctrine, it must be shown that the accident was of a type which ordinarily does not occur in the absence of someone's negligence, that the accident was caused by an agency or instrumentality *within exclusive control* of defendant, that the accident was not due to any voluntary action on part of the plaintiff, and that the plaintiff was not in a position to show particular circumstances which caused the offending agency or instrumentality to operate to his injury. *Jackson v. H. H. Robertson Co., supra; Byars v. Arizona Public Service Co.*, 24 Ariz.App. 420, 539 P.2d 534 (1975). Payne presented *no* evidence to show that the scaffold was in the exclusive control of Greenberg. Therefore, it would have been improper to send this matter to the jury without direct evidence that there had been a breach of duty. It is not sufficient that the facts are such that negligence might have existed; it must affirmatively appear that it did. *McGuire v. Valley National Bank of Phoenix*, 94 Ariz. 50, 381 P.2d 588 (1963). The burden of proving negligence

rested upon Payne. It was not Greenberg's responsibility to prove an absence of negligence. *Porterie v. Peters*, 111 Ariz. 452, 532 P.2d 514 (1975). For these reasons, we find that the trial court correctly directed a verdict in favor of Greenberg.

### VIDEOTAPED EXPERIMENT

Payne's final assignment of error is that the trial court improperly refused to admit a videotaped scaffold experiment. The videotape showed a scaffold being jacked up, having its frame lowered, leaning, and finally toppling.

Commenting upon the admissibility of physical demonstrations in the courtroom, Udall, Arizona Law of Evidence § 136, at 289–90 (1960) provides:

> The court may permit evidence in the courtroom by way of physical demonstrations, tests, or experiments. However, a foundation is required, and the party offering to perform such a demonstration or test must establish that the conditions and circumstances are identical or substantially similar to those existing at the time of the events in issue. The admission of experimental evidence rests very largely in the discretion of the trial judge and the exercise of this discretion will not be controlled unless manifestly abused.

(footnotes omitted); *accord, Ong v. Pacific Finance Corp.*, 70 Ariz. 426, 222 P.2d 801 (1950); *State v. Buelna*, 25 Ariz.App. 414, 544 P.2d 238 (1976).

 The trial court ruled that the experiment in this case was inadmissible, stating that the conditions of the experiment were not sufficiently similar to the events of the actual occurrence. Specifically, the following objections were raised regarding the dissimilar conditions of the experiment: (1) planks on the experimental scaffold were positioned differently than planks on the actual scaffold; (2) the experimental scaffold was located on asphalt while the actual scaffold was built on concrete; (3) no evidence was presented by Payne that the incline, or degree of slope, of the surface where the experiment was conducted was

similar to the incline of the floor where the accident occurred; (4) a rope was attached to the experimental scaffold, but there was no rope on the actual scaffold; (5) the placing of two 100 pound bags of sand on top of the experimental scaffold was not a sufficient duplication of Hair and Payne on the actual scaffold.

Payne has cited *Rayner v. Stauffer Chemical Co.*, 120 Ariz. 328, 585 P.2d 1240 (1978), as authority for the proposition that it is not a requirement that an experiment be substantially similar to the conditions of the events in issue to be admissible. However, in *Rayner*, the experiment was designed to show general traits and capacities of materials involved in the controversy and was not an attempt to reenact or simulate the whole or substantial part of the original happening. In contrast to this type of experiment, Payne's videotape was an attempt to reproduce the original happening.

The probative value of this experiment is also questionable. Payne's attorney stated that the experiment was conducted because "[w]e were interested in knowing whether or not a scaffold this high would topple, since it is essentially a heavy scaffold, and what the weight would do on it." In response to the offer of proof, the court stated:

> [I]t strikes me there is no issue about the fact that the thing fell over. . . . I don't think either counsel are going to attempt to argue, nor would I permit them to argue that it didn't fall over.

In determining the admissibility of evidence, the trial court has considerable discretion, and such discretion will not be disturbed on appeal unless it has been clearly abused. *State v. Starks*, 122 Ariz. 531, 596 P.2d 366 (1979); *State v. Mosley*, 119 Ariz. 393, 581 P.2d 238 (1978). We find no abuse in the court's decision to exclude this videotape demonstration.

■ Even if the trial court had improperly refused to admit Payne's videotape, it would have been harmless error because it was introduced to demonstrate that the scaffold would topple. This fact was uncontested at trial. Such additional evidence would simply have been cumulative since abundant evidence on this issue was received. *Lewis v. Southern Pacific Co.*, 102 Ariz. 108, 425 P.2d 840 (1967).

Having found no error, the judgments in favor of Starr and Greenberg are affirmed.

OGG and CORCORAN, JJ., concur.

NOTE: The Honorable ROBERT J. CORCORAN was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz.Const. art. VI, § 3.