702 P.2d 696

**NORTHERN ARIZONA GAS SERVICE, INC., Plaintiff-Appellee, Cross-Appellant,**

v.

**PETROLANE TRANSPORT, INC., Defendant-Appellant, Cross-Appellee.**

**No. 1 CA–CIV 6279.**

Court of Appeals of Arizona, Division I, Department D.

Filed Dec. 24, 1984.

Reconsideration Denied April 3, 1985.

Review Denied June 25, 1985.

Gust, Rosenfeld, Divelbess & Henderson by Richard A. Segal, Michael L. McAllister and Fred Cole, Phoenix, for plaintiff-appellee, cross-appellant.

Lewis & Roca by John P. Frank, Susan M. Freeman, David J. Cantelme, Phoenix, and Duecy, Moore, Robinson & Bennett by William F. Bennett, Scottsdale, for defendant-appellant, cross-appellee.

## OPINION

HAIRE, Presiding Judge.

This is an appeal from the trial court's grant of summary judgment in favor of the appellee on its breach of contract claim and the award of damages after a subsequent trial to the court. The appellee, Northern Arizona Gas Service (NAGS), claimed that appellant, Petrolane, had charged more for liquified petroleum gas (LPG) than was permitted by a fuel supply agreement existing between the parties. Petrolane's primary contention on appeal is that the contract must be re-interpreted in light of federal regulations enacted during the term of the contract. In addition, Petrolane raises several issues relating to the trial court's rejection of its defenses of waiver and failure to mitigate and to the measure of damages. NAGS filed a cross-appeal challenging the trial court's denial of its claim for prejudgment interest on the damages awarded.

## FACTS

Petrolane is a supplier of LPG. NAGS is a wholesale and retail seller of that commodity. The LPG involved was propane gas used mainly as a fuel in central heating systems, for cooking, water heating, and other domestic uses. It is transported by truck or rail and sold in tanks and cylinders for domestic use.

The parties entered into a long-term "Fuel Supply Agreement" in 1966. The price was to be determined as follows:

"BUYER agrees to pay SELLER for all liquified petroleum gas delivered to

BUYER at the following destination prices, adjusted upward or downward from time to time to reflect increases or decreases in SELLER'S delivered cost of gas to such locations...."

It went on to list specific prices, in cents per gallon, for delivery to given locations. The agreement then requires that, in case of a change in price the seller shall, upon written request:

"... furnish BUYER with an explanation in reasonable detail of the cost factors which changed to produce an increase or decrease in SELLER'S delivered cost of gas to various locations...."

The agreement also contained a clause excusing non-performance by either party to the extent that it was caused by "interference or regulation by any public bodies or officer acting under claim of authority ... [or by a] shortage of products...."

Between the execution of the agreement in 1966 and the enactment of federal regulations in 1973 "delivered cost" was interpreted by both parties as dependent on the actual cost of gas delivered to NAGS. Changes in price essentially reflected changes in acquisition or transportation costs. Most of the gas delivered to NAGS was from the El Paso Natural Gas Refinery at Wingate, New Mexico, and nearly all the price adjustments during that period were based on the shifts in price at that refinery.

In 1973 Congress enacted the Emergency Petroleum Allocation Act. 15 U.S.C. § 751 et seq. Pursuant to its mandate, the federal government enacted mandatory price and allocation regulations, codified at 10 C.F.R. § 205 et seq. The regulations established a ceiling on the price suppliers of petroleum products could charge.

"... seller may not charge a price ... which *exceeds* the weighted average price ... [charged] ... on May 15, 1973, plus an amount which reflects, on a dollar-for-dollar basis, the increased product costs concerned." 10 C.F.R. § 212.-93(a)(1); (emphasis added).

The weighted average price is calculated on the basis of the seller's entire undivided stock of regulated products, unless the seller's historic practice was to use separate inventories. 10 C.F.R. § 212.92(d). If separate inventories were used, separate and corresponding weighted averages could be computed. The regulations permit sellers to include specific product and non-product costs in calculating their maximum lawful price. 10 C.F.R. §§ 212.92(d), 212.-93(b)(4)(iii).

Petrolane had not, prior to 1973, "pooled" gas from the El Paso Refinery with that from any other source either physically or for accounting purposes. In response to the new regulations, however, it created a regional pool which averaged together the prices charged by its sources for southern California and Arizona customers. From that point on, NAGS was charged a higher price based on this pool's weighted average cost, even though the gas which was actually delivered continued to come primarily from the El Paso refinery. Petrolane continued to maintain records of its actual costs, as well as the "pool" cost records it was required to keep to calculate its weighted average.

NAGS questioned Petrolane about the increases in price and was told that they were caused by the government's pooling requirements. Nevertheless, NAGS continued to purchase its LPG from Petrolane until 1976, when it requested substantiation of the increases. Petrolane responded with a letter demonstrating its increased pool costs. It did not provide NAGS with information on the actual cost of LPG delivered, although those figures were available. Unsatisfied with Petrolane's response, NAGS began to buy surplus LPG on the spot market. Occasionally no surplus was available and NAGS purchased LPG from Petrolane.

NAGS initiated this action by filing a complaint in July of 1979 alleging that Petrolane had been overcharging for LPG since 1973. The statute of limitations barred claims for the pre-1975 period. The trial judge granted NAGS' motion for summary judgment on the issue of breach of

contract. Upon a motion for reconsideration and clarification by Petrolane, the trial judge confirmed her decision, finding as matters of law that the term "delivered cost" was unambiguous and that the enactment of the government regulations did not render it ambiguous. The balance of the action was heard by a different trial judge, with evidence being presented relating to waiver, mitigation and damages in a three day trial.

After hearing the evidence, the trial judge concluded that the contract allowed a profit margin of 1.723 cents per gallon, the margin as it existed in the first quarter of 1973, and awarded NAGS the sums it had paid in excess of that amount. He rejected Petrolane's defenses of waiver and failure to mitigate and its assertion of a "pass-through" defense.

### A. The Effect of the Government Regulations on the Contract.

Petrolane's primary contention on appeal, as previously stated, is that the government regulations re-defined "delivered cost" as it was used in the fuel supply agreement, and thus that Petrolane was justified in charging NAGS a price which reflected costs of supplying customers throughout southern California and Arizona rather than the actual cost of the products supplied to NAGS. In response, NAGS argues that the agreement is unambiguous and unaffected by the government regulations.

In reviewing a summary judgment, this court must view the record in the light most favorable to the party against whom the motion was directed. *Payne v. M. Greenberg Construction*, 130 Ariz. 338, 343, 636 P.2d 116, 121 (App. 1981). We are limited to the evidence before the trial court when the motion was heard and may not consider evidence presented at the subsequent trial. *Id.*

The meaning of delivered cost before the regulations were enacted is undisputed. Petrolane admits that it consisted of an opening price, which included a mar-

gin for overhead and profit, and which was to be adjusted up or down to reflect fluctuations in the actual cost of the product delivered to NAGS' various locations. Petrolane has abandoned its original argument that the subsequent government regulations compelled it to breach the contract.

Petrolane now contends that the regulations, in effect, imposed a new definition of "cost" which replaced the parties' prior interpretation of the contract, relying on *Nevada Half Moon Mining Co. v. Combined Metals R. Co.*, 176 F.2d 73 (10th Cir.1949) and *North Central Airlines, Inc. v. Continental Oil Co.*, 574 F.2d 582 (D.C.Cir.1978).

The controversy in *Nevada Half Moon* concerned a contract for the sale of a mine. The contract obligated the buyer to pay a royalty of 2½ percent of the net mill or smelter returns from the sale or disposal of the ores mined for a period of 10 years. 176 F.2d at 74. During the term of the contract, Congress placed a ceiling on the production of certain minerals and authorized subsidy payments to affected miners. The buyer of the Nevada Half Moon Mine received subsidy payments, but refused to pay the seller any royalty on them because they did not come within the contract definition of net smelter returns. The court of appeals held that in light of the parties' obvious intent that the buyer pay for the mine, the subsidy payments were the equivalent of "returns paid for ores" under the contract and that the royalty should be paid. *Id.* at 75.

Petrolane argues that this was an expansion of the contract term beyond its original definition to encompass the government regulations and that the same principle should be applied here. Delivered cost would be expanded to include the additional costs that the regulations permit oil companies to charge.

*Nevada Half Moon* is distinguishable from this case. The mining regulations flatly prohibited the buyer from continuing to mine and sell ores as the parties had contemplated and supplanted their method for determining the amount of the payments. The regulations replaced "returns

for ores" with its equivalent, subsidy payments. There has been no such replacement in this case. Petrolane was not forced to change the price it charged so long as it was below the maximum. *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 460 F.Supp. 1359, 1375 (D. Hawaii 1978):

"Under the regulatory plan, pricing regulations do establish *maximum* prices, but other than that, 'it is abundantly clear that Congress specifically contemplated the use of free market prices in the regulatory scheme.'" (Footnote omitted; emphasis in original).

The method of establishing the price of LPG under the contract was left untouched. Petrolane continued, in fact, to maintain the records necessary to calculate the price under the contract. Petrolane's reliance on *Nevada Half Moon* is therefore misplaced.

Petrolane also relies heavily on *North Central Airlines, supra.* At issue in *North Central* was a fuel supply contract that contained an escalation clause which used the average posted price for a particular grade and weight of crude oil as a benchmark for determining price increases. 574 F.2d at 584. Posted price is the price paid for crude oil by a refiner and is published periodically in price bulletins. *Id.* at 585. The parties intended, through that clause, to eliminate the need to renegotiate the contract by tying the price to the cost of raw material. *Id.*

The Federal Cost-of-Living Council, as a part of the same general framework of price controls and incentives central to the controversy between Petrolane and NAGS, imposed two-tier price regulations on crude oil. The regulations froze the price of oil from "old" sources but exempted oil from newly discovered sources from control. This would stabilize prices while providing economic incentives for new discoveries of oil.

The trial court ruled that "posted price" meant only the lower, frozen price. *Id.* at 586. The court of appeals reversed, stating that the original term was too indefinite in this context to be applied. Lacking any basis on which to choose between the two posted prices, the court remanded for determination of a reasonable price. *Id.* at 590.

Petrolane asserts that a similar approach should be followed here, with the contract phrase "delivered cost" reinterpreted in light of the government regulations. This position ignores several important differences between *North Central* and this case.

The term "posted price" used in the *North Central* contract is a term used throughout the industry. It was not created by the parties in an effort to ascertain and pass on actual costs, but was utilized as an external benchmark by which they could measure market prices. Petrolane and NAGS, in contrast, chose to link their contract price directly to Petrolane's actual cost.

Before the enactment of the regulations in *North Central* there was one posted price. Afterwards, there were two. The regulations did not alter the terms of the contract, they simply made it impossible to use the price-setting method specified in the agreement. There is no such confusion created by the regulations governing Petrolane and NAGS. The elements comprising the non-product costs which Petrolane is permitted to factor into its maximum price are clearly enumerated. The fuel supply agreement between the parties did not permit Petrolane to pass along all of these costs, and the regulations did not require it to do so. *North Central* does not support Petrolane's assertion.

Petrolane next argues that the weight-averaging concept forced it to raise prices in Arizona because it was required to lower them in California. This result was not mandated by the regulations. A Petrolane employee stated that as long as the maximum price is not exceeded, "[t]he Government doesn't care what you sell [LPG] for." Different customers within the pool were charged different prices, based on marketing decisions made by Petrolane. It is also clear from the record before the court on summary judgment that Petrolane

itself chose to place southern California and Arizona in the same regional pool in contemplation of these very regulations. The composition of the pool did not reflect historic practices. Although the Department of Energy (DOE) acquiesced to Petrolane's proposed regional pool, it did not create it. In fact although Petrolane began charging according to pooled costs in 1973, it did not receive DOE approval until 1978. Absent Petrolane's voluntary placement of California in a pool with lower priced sources, nothing in the regulations would have forced Petrolane to lower its prices there.

## B. Government Interference.

Petrolane contends that even though the regulations only set maximum prices, the net effect of the entire regulatory scheme was coercive and interfered with performance of the contract. The contract's interference clause is broader than the standard set for "impossibility" or "impracticability" under the UCC but still only excuses non-performance caused by government regulations. *See* A.R.S. § 47–2615, UCC § 2–615. In determining whether the increased prices were caused by the regulations, Petrolane urges that this court adopt the view taken by the Fifth Circuit Court of Appeals in *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957 (5th Cir.1976) and focus upon the "reality of coercion" rather than the specific form which it may have taken. *Id.* at 995.

■ Doing so, we yet fail to find a reality of coercion. No government compulsion or threat of compulsion prevented Petrolane from performing the agreement in accordance with its terms. The regulations controlled only maximum prices. Sellers were free to set prices below that ceiling as they saw fit and Petrolane in fact did so. It sold at less than the maximum to NAGS and sold at a profit in California. Provisions existed in the regulations permitting Petrolane to recoup the margin between the price at which it sold to NAGS and the allowed maximum. *Unrecouped Increased Product Costs Where Prices Charged Under Fixed-Price Contracts Are Less Than the Lawful Base Price,* DOE Ruling 1974–12, 39 F.R. 18423, May 28, 1974. The regional pool including Arizona and southern California was not forced on Petrolane, but rather was chosen by it. Even the conceivably coercive effect of having to keep complex records of the pool inventory in order to comply with the regulations is negated by Petrolane's continued voluntary maintenance of two sets of books. It knew at all times what its actual costs were to NAGS.

Furthermore, preexisting fixed-price contracts were not affected by the regulations. The DOE has addressed the situation where a refiner sells fuel to a firm at a price specified under a fixed-price contract which was less than the maximum price allowed under the regulations. It ruled that the refiner should honor the contract, and could incorporate the shortages in computing its base price for the next month and spread the shortage over all classes of purchasers equally. DOE Ruling 1974–12, *supra.* Sales in compliance with the objectives of the regulations were not viewed as discriminatory in violation of 10 CFR § 210.62(b). Thus, Petrolane would not have risked penalties under the regulations, if it had continued to perform under its contract.

Petrolane admitted that it would not have had to charge NAGS the same price as its other customers if it had had a fixed-price contract, but argues that because NAGS was not entitled to LPG from a particular source, there was no fixed-price contract. We reject this argument. We conclude that the contract was for a fixed price—opening price, including profit margin, plus actual cost of product delivered. Since the regulations did not require a different price, there was no government interference in the contract.

■ In our opinion it was proper to dispose of these issues on summary judgment. There are no material facts in dispute. The meaning of "delivered cost" is made unambiguous by the prior course of performance between the parties, and was not rendered ambiguous by the inception of the regula-

tory scheme. We therefore conclude that summary judgment on the issue of breach was properly granted. We turn next to the issues raised relating to the trial.

*C. "Pass-Through" Defense.*

■ Petrolane argues that NAGS passed any overcharge on to its customers and thus suffered no damage. It relies on a little-used doctrine discussed, but rarely allowed, in anti-trust cases. The threshold question is, of course, whether the "passing on" doctrine has any applicability outside the anti-trust area. Although the theory has been discussed in several other contexts, all of them are analogous to anti-trust in that each involved an overcharge which violated a federal statute. *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (Interstate Commerce Act); *Chicago, M., St. P. & P.R. Co. v. Alouette Peat Products*, 253 F.2d 449 (9th Cir.1957) (Interstate Commerce Act); *Abbotts Dairies Div. of Fairmont Foods Inc. v. Butz*, 584 F.2d 12 (3rd Cir.1978) (Agricultural Adjustment Act). The controversy between Petrolane and NAGS centers on a breach of contract, not a violation of the regulatory system, so Petrolane's argument is inapposite. Even assuming *arguendo* that Petrolane is proper in relying on anti-trust cases, however, an analysis of those decisions demonstrates that this case does not fall within the limited exception which allows the pass-through defense.

The reasons for the almost universal disallowance of the defense are clear. The defense is typically asserted by a wholesaler or carrier as a defense to an action for damages by a middleman who had gone on to sell his product to his customers, presumably passing on the unlawfully high cost. In each case the defense has been rejected on one or both of two grounds.

The first rationale is that the ultimate customers either could not sue the wrongdoer, or as a practical matter would be unlikely to do so. In *Darnell-Taenzer*, for example, the purchasers of products shipped at an unlawful rate could not sue

the carrier because they lacked privity of contract. Recognition of the passing-on defense would preclude recovery from the only party who was in privity—the middleman—and allow the railroad to retain its illegal profits. The defense was therefore rejected.

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court reasoned that the ultimate consumers, purchasers of shoes, would have so small a stake in a lawsuit that they would be unlikely to institute even a class action. Again, the wrongdoer would be able to retain his profits. The passing-on defense was rejected.

■ The second ground for rejecting the defense is a practical one—the complexity of proof. Quantifying the costs passed on to customers and separating them from the damage to the direct purchaser resulting from loss of volume or profits requires sophisticated analysis of market forces. Such projections are by their very nature speculative. 392 U.S. at 491–494, 88 S.Ct. at 2230–2232, 20 L.Ed.2d at 1238–1242.

It is in this context that the *Hanover* Court recognized the possibility of an exception to its disallowance of the pass-through defense.

> "We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present."

*Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. at 2232, 20 L.Ed.2d at 1242. The court explained in a later decision that where a preexisting fixed quantity cost-plus contract exists:

> "The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case."

*Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736, 97 S.Ct. 2061, 2070, 52 L.Ed.2d 707, 719 (1977).

Neither of these grounds for allowing the passing-on defense applies to this situation. Petrolane argues that NAGS' waiver of its claim for damages from lost profits brings it within the fixed quantities/cost-plus exception. As proponent of the passing-on defense, however, Petrolane had the burden of establishing preexisting contracts fitting the exception. *Abbotts Dairies, supra.* There is no evidence that any contracts which existed between NAGS and its customers were for fixed quantities of LPG. The quantities sold by NAGS in fact showed substantial variation over the years. Neither were there cost-plus contracts. The prices charged by NAGS to its customers varied as to time and type of customer. Only the maximum price was fixed by statute. While there is evidence that NAGS passed through some costs to its customers, there is no evidence demonstrating the actual increase in NAGS' costs or the effect that had on its prices, or on the volume of its sales.

■ NAGS' waiver of its claim for lost profits did not constitute an admission that none resulted from Petrolane's activities. Rather, it was based on the complexity of issues of proof—the very reason for the supreme court's rejection of the passing-on defense in *Hanover Shoe.*

■ Perhaps more importantly, the policy reason for disallowing the pass-through defense in anti-trust cases applies here with equal force. If Petrolane were permitted to assert this defense against NAGS, it would be able to retain its overcharges with impunity. Since NAGS' customers, the parties who ultimately absorbed at least some part of the damage, were not in privity with Petrolane, they cannot sue on the contract. The overcharges did not violate the regulations so their remedial provisions would not be available. NAGS is the only party that can recover the overcharge from Petrolane, and it will be permitted to do so.

### D. Waiver.

Despite increased costs, NAGS purchased LPG regularly from Petrolane through 1976, and on an infrequent basis into 1979. Petrolane urges that NAGS' unexplained delay in enforcing its contract rights constituted a waiver of Petrolane's breach.

■ The law is clear in Arizona. A waiver is an intentional relinquishment of a known right. *Yuma County v. Arizona Edison Co.,* 65 Ariz. 332, 180 P.2d 868 (1947); *City of Glendale v. Coquat,* 46 Ariz. 478, 52 P.2d 1178 (1935); *Albert v. Joralemon,* 271 F.2d 236 (9th Cir.1959) (applying Arizona law). It may be express or inferred from conduct. *Concannon v. Yewell,* 16 Ariz.App. 320, 493 P.2d 122 (1972). Whether a right has been waived is a question of fact for the trial court. *Home Owners' Loan Corp. v. Bank of Arizona,* 54 Ariz. 146, 94 P.2d 437 (1939); *Concannon, supra.* Findings of fact by the trial judge are binding on this court unless clearly erroneous. *United Bank v. Mesa N.O. Nelson Co.,* 121 Ariz. 438, 590 P.2d 1384 (1979); *Home Owners' Loan Corp., supra; Walls v. Stewart Building and Roofing Supply, Inc.,* 23 Ariz.App. 123, 531 P.2d 168 (1975); *Concannon, supra.*

The trial judge found that NAGS had not waived its rights under the fuel supply agreement. Officers of NAGS questioned the price increases several times between 1973 and 1976. They met with Petrolane's representatives in November of 1975, and wrote requesting substantiation of the increases in June 1976. In response to these requests, Petrolane told NAGS that its increases were caused by the government-imposed inventory pooling, and supplied figures on its pool costs. It did not reveal its records of the actual cost of gas delivered to NAGS, or that it was charging not the maximum lawful price, but "what the market would bear." Communications from NAGS to Petrolane confirmed NAGS' belief that the prices were mandated.

The cases Petrolane advances in support of its defense are not persuasive. It relies

on two Arizona decisions to demonstrate that a party to a contract may waive a breach by permitting the breaching party to continue performance. In the first, *Pima Farms Co. v. Fowler*, 32 Ariz. 331, 258 P. 256 (1927), although the buyer did not know that the seller's receiver was prepared to perform under the contract, he did know that the seller had failed to perform, thereby breaching the contract. His failure to attempt to enforce his rights for several years in spite of the known breach waived them.

The other case is completely inapposite. The guarantor on a promissory note argued that the seller's escrow agent had waived the right to accelerate the note by accepting a payment. The court refused to find waiver because the seller had filed a complaint and served the guarantor before the guarantor had attempted to make payment. He was thus fully aware that the escrow agent was without authority to waive the acceleration clause. *Frei v. Hamilton*, 123 Ariz. 544, 601 P.2d 307 (App.1979).

The Seventh Circuit Court of Appeals case that Petrolane cites for additional support is merely another wherein the non-breaching party was cognizant of the breach, yet failed to act for several years. *Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208 (7th Cir.1979). The court held that his silent acquiescence had "ripened" into waiver.

 There is conflicting evidence as to precisely when NAGS became aware of the fact of Petrolane's overcharge. There is credible evidence from which the trial judge could have found that NAGS did not know of the breach until some late date. Obviously, NAGS' failure to attempt to enforce its rights or to give written notice of a breach it was unaware of cannot be interpreted as a waiver.

 Similarly, Petrolane's discussion of the UCC notice requirement falls short of the mark. A.R.S. § 47–2607(C)(1) (UCC § 2–607(c)(1)) requires notice "within a reasonable time after [the buyer] discovers or should have discovered any breach...." What constitutes a reasonable time is a question of fact to be determined by the trial judge. *Colvin v. Superior Equipment Co.*, 96 Ariz. 113, 120, 392 P.2d 778, 782, (1964). The issue has been decided here against Petrolane. The fact of the overcharge was not apparent from examining the goods. The increases in Petrolane's delivered costs were peculiarly within its own knowledge. The non-conformity to the contract price term was undisclosed, obscured by vague references to pooled costs and mandatory price increases. We conclude that there was evidence supporting the trial court's finding that NAGS did not waive its rights under the contract.

### E. Failure to Mitigate.

The trial court found that NAGS took reasonable steps to mitigate its damages. Petrolane challenges this finding, contending that NAGS should have requested exception relief for an alternate supplier, as permitted under the federal regulations.

 The party injured by a breach of contract has a duty to take reasonable steps to avoid the consequences of known injuries. *Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 518, 446 P.2d 458, 461 (1968); *Fairway Builders, Inc. v. Malouf Towers Rental Co., Inc.*, 124 Ariz. 242, 255, 603 P.2d 513, 526 (App.1979); *Barnes v. Lopez*, 25 Ariz.App. 477, 481, 544 P.2d 694, 698 (1976). The party in breach has the burden of showing that mitigation was reasonably possible, but was not reasonably attempted. *Fairway Builders, supra*, 124 Ariz. at 255, 603 P.2d at 526. Whether the duty is violated is a question of fact. 124 Ariz. at 256, 603 P.2d at 526. The trial judge's finding in favor of NAGS cannot be overturned by this court unless it is clearly erroneous.

 There is ample evidence to support the finding. Petrolane introduced opinion testimony by a former employee of the Federal Energy Administration's Office of Exceptions and Appeals, the agency responsible for decisions concerning exception relief, about the way in which requests

for relief were processed and the kinds of information the agency generally considered. Although the witness testified to his opinion that relief would have been possible in NAGS' situation, Petrolane did not support its witness's opinions with concrete evidence of the factors he testified the decision would be based on: NAGS' actual financial condition and supply costs, the difference in costs of propane between NAGS and its competitors, projections of the financial impact of the regulations on NAGS, and the availability of surplus propane at a competitive price.

Furthermore, NAGS' damages resulted not from the operation of the regulations, but from Petrolane's breach of contract. Exception relief was designed to remedy inequities caused by the regulations, not a supplier's breach of contract. An analysis of the decisions in 1974 and 1975 by the FEA showed that most applications for exception relief were denied.

Finally, and fatally to Petrolane's argument, an innocent party cannot be expected to take steps to mitigate damages before it is aware of the breach. *Fairway Builders, Inc. v. Malouf Towers Rental Co., Inc.*, 124 Ariz. 242, 603 P.2d 513 (App. 1979). In *Fairway* the defendant, an installer of marblecrete on a construction project, argued that the plaintiff had failed to mitigate damages by not repairing the material when it first began falling off the walls. The court held, as a matter of law, that defendant had not met its burden of proof since it would be unreasonable to impose the obligation to repair on the plaintiff until the extent of the breach was ascertainable, some two years after the installation. 124 Ariz. at 256, 603 P.2d at 526. Under the evidence presented in this case we find no error in the trial court's determination of the mitigation issue, and the trial court's decision is upheld.

### F. Damages.

Finally, Petrolane objects to both the damage formula imposed by the trial court and the measure of damages. The trial court ruled that NAGS was entitled to the cost of "cover" less the contract price. It found that cover encompassed both the LPG bought from other suppliers and that bought from Petrolane at prices exceeding those permitted by the contract. Petrolane contends that cover is not available to NAGS because it accepted the goods. It also argues that on several occasions NAGS purchased LPG from other suppliers when Petrolane was charging less.

Petrolane is correct in pointing out that A.R.S. § 47–2711 (UCC § 2–711) provides buyers remedies when the seller has failed to deliver or the buyer has rejected delivery. NAGS did not refuse to accept goods tendered by Petrolane. It did turn elsewhere to purchase substitute goods, unaware that a breach of the contract had occurred. We do not have to decide whether this constitutes a rejection because even if we apply the subsection suggested by Petrolane the trial judge's formula for damages must be affirmed.

A.R.S. § 47–2714 (UCC § 2–714) deals with circumstances in which the buyer has accepted non-conforming goods and the time for revocation is past. Comment 1 to UCC § 2–714. After giving notice of breach in compliance with § 47–2607(C), (UCC § 2–607) the buyer may recover damages for his loss "as determined in any manner which is reasonable." § 47–2714(A). We have already rejected Petrolane's contention that NAGS failed to comply with the notice requirement. We refuse to hold that the trial judge's formulation of damages was not reasonable.

Damages recoverable in a contract action are those proximately caused by the breach. *Thunderbird Metallurgical, Inc. v. Arizona Testing Laboratories*, 5 Ariz.App. 48, 423 P.2d 124 (1967). The aim is to yield the net amount of losses caused. *A.R.A. Manufacturing Co. v. Pierce*, 86 Ariz. 136, 341 P.2d 928 (1959). But for Petrolane's breach of its contract, NAGS would have paid the contract price for all of its LPG requirements between 1973 and 1979. Instead, it was forced to spend more in obtaining LPG either from

Petrolane or substitute suppliers. NAGS' loss is thus equal to the cost incurred in these substitute transactions minus the price at which it was entitled to buy LPG under the contract—cost of cover less contract price.

Petrolane urges that this court reduce the award of damages by an amount equal to that paid by NAGS to other suppliers at prices higher than Petrolane's. There is some conflict in the evidence. While NAGS' officials admitted to paying higher prices to alternate suppliers on a few occasions, they stated that freight differentials between the various sources made those purchases more economical.

As discussed previously, the trial court found that NAGS took reasonable steps to mitigate its damages. This decision implies that NAGS acted reasonably in purchasing its substitute LPG. Whether a party has acted reasonably under the circumstances is not to be measured by *ex post facto* wisdom. *Fulton v. Woodford,* 17 Ariz.App. 490, 495, 498 P.2d 564, 569 (1972). We reject Petrolane's argument.

Petrolane also argues that the trial judge miscalculated the gross profit margin to be applied in measuring NAGS' damages. As stated previously, the price allowed by the fuel supply agreement, the "delivered cost," consisted of an opening price, which included a gross profit margin, and which was to be adjusted up or down to reflect fluctuations in the actual cost of the LPG delivered to NAGS' various locations. The 1966 opening price could not be determined. The trial court refused to permit NAGS to prove damages incurred prior to July 17, 1975 because they were outside the statute of limitations. Petrolane's records, however, permitted the calculation of the average profit margin for the first quarter of 1973—1.723 cents per gallon. The delivery costs were undisputed. The actual cost to Petrolane for the LPG it sold to NAGS was taken by NAGS from Petrolane's own records. Thus, every element of delivered cost was reconstructed by NAGS.

Petrolane does not contend that NAGS erred in its reconstruction of actual costs. It did not present its own evidence on actual freight or other costs. It did not controvert NAGS' calculations of the profit margin as it existed in early 1973, immediately prior to the date the price controls went into effect. Petrolane only urges that this court apply the formula set out by the DOE and allow Petrolane to pass through the additional non-product costs the regulations permit sellers to recover. We have already addressed this point. The regulations permitted costs to be passed along that were not contemplated in the contract between Petrolane and NAGS. Petrolane had the opportunity to present evidence on its actual cost increases and chose not to do so. The trial court's margin of 1.723 cents per gallon is supported by the evidence and the award of damages in the amount of $2,332,981.00 is affirmed.

## G. The Cross-Appeal.

NAGS' cross-appeal challenged the trial court's denial of pre-judgment interest on its claim against Petrolane. Pre-judgment interest is due on liquidated claims. *L.M. White Con. Co. v. St. Joseph Structural Steel Co.,* 15 Ariz.App. 260, 488 P.2d 196 (1971); *Betz v. Goff,* 5 Ariz.App. 404, 427 P.2d 538 (1967). A claim is liquidated "if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion." *Homes & Son Construction Co., Inc. v. Bolo Corp.,* 22 Ariz.App. 303, 306, 526 P.2d 1258, 1261 (1974).

This test is not met here. The trial court exercised discretion in arriving at several of the elements in its damage formula. It chose to use the average profit margin from the first quarter of 1973 rather than an overall average or an average calculated for some other period of time. While this was a reasonable choice, it was certainly not predictable by Petrolane. For purposes of calculating Petrolane's cost on occasions when NAGS bought from other suppliers, the trial court assumed that Pe-

trolane purchased five-sixths (⅚) of its LPG from El Paso and one-sixth (⅙) from Enterprise—again, a reasonable choice, but discretionary. In addition, whether NAGS had acted reasonably to mitigate its damage and in procuring cover were elements of damage that could only be decided by the trial court after considering conflicting evidence and inferences. We conclude that this uncertainty is inconsistent with the concept of liquidated damages and affirm the trial court's denial of pre-judgment interest.

We affirm the judgment entered by the trial court. As there has been no claim for attorney's fees on appeal in compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure, none are awarded.

KLEINSCHMIDT and OGG, JJ., concur.